IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TEXAS ENTERTAINMENT ASSOCIATION, INC., et al., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:21-CV-519-RP |
| KEN PAXTON, *Attorney General of Texas*, and ED SERNA, *in his official capacity as Executive Director of the Texas Workforce Commission*, | § § § § | |
| Defendants. | § § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

On January 22, 2024, the Court held a bench trial in this matter. (Dkt. 111). Plaintiffs Texas Entertainment Association, Inc. (the "TEA"), et al.[1] ("Plaintiffs") and Defendants Ken Paxton, in his official capacity as Attorney General of Texas, and Ed Serna, in his official capacity as Executive Director of the Texas Workforce Commission ("Defendants") submitted post-trial proposed finds of fact and conclusions of law. (Pls.' Proposed Findings of Fact, Dkt. 114; Defs.' Findings of Fact, Dkt. 115). Having considered the evidence and testimony presented at trial, the arguments of counsel, the briefing, and the governing law, the Court enters the following findings of fact and conclusions of law.

---

[1] Plaintiffs in this case initially included several individuals under 21 years of age who sought employment at sexually oriented businesses. (*See* Am. Compl., Dkt. 39, at 3). At the bench trial held in this case, the Court confirmed that each of these Plaintiffs has since turned 21, rendering their claims moot. (Tr., Dkt. 116, at 88–89). Defendants moved to dismiss those Plaintiffs' claims, which the Court granted as unopposed on the record. (*Id.*). Accordingly, Plaintiffs Felix Valadez, Luis Carrizoza ("Carrizoza"), Abigail Reyes ("Reyes"), Amada Man ("Man"), and Evanny Salazar ("Salazar") are terminated as parties in this case.

## I. BACKGROUND

This case concerns Texas Senate Bill 315, 87th Leg. R.S. (2021) ("S.B. 315"), a recently enacted Texas law that prohibits adults under 21 years of age from working at sexually oriented businesses ("SOBs"), with the goal of reducing sex trafficking. (Compl., Dkt. 1, at 15–32).

### A. S.B. 315

Plaintiffs challenge the constitutionality of S.B. 315's age-related amendments to provisions of the Texas Civil Practice & Remedies Code, Labor Code, and Penal Code. S.B. 315 is styled as a law "relating to restrictions on the age of persons employed by or allowed on the premises of a sexually oriented business; creating a criminal offense." Tex. S.B. 315, 87th Leg. R.S. (2021). Texas law defines SOBs as any:

> [S]ex parlor, nude studio, modeling studio, love parlor, adult bookstore, adult movie theater, adult video arcade, adult movie arcade, adult video store, adult motel, or other commercial enterprise the primary business of which is the offering of a service or the selling, renting, or exhibiting of devices or any other items intended to provide sexual stimulation or sexual gratification to the customer."

Tex. Loc. Gov't Code Ann. § 243.002.

S.B. 315 amended various portions of existing Texas laws regarding minors and SOBs. First, Section 5 of S.B. 315 amended Chapter 125 of the Texas Civil Practice & Remedies Code to create a common nuisance to "employ[] or enter[] into a contract for the performance of work or the provision of a service with an individual younger than 21 years of age for work or services performed [a minor] at a sexually oriented business as defined by Section 243.002 of the Local Government Code. Tex. S.B. 315, § 5, 87th Leg. R.S. (2021) (amending Tex. Civ. Prac. & Rem. Code § 125.0015(a)(19), (22)). Second, Section 8 of S.B. 315 amended Texas Penal Code Section 43.251 by changing its definition of "child" to mean "a person younger than 21 [18] years of age." Tex. S.B. 315, § 8, 87th Leg. R.S. (2021) (formatting in original) (amending Tex. Penal Code § 43.251(a)(1)). As a result, a person who "employs, authorizes, or induces" someone under the age of

21 to work in or with a SOB is subject to felony charges. *Id.* at § 43.251(a)-(c). This amendment affects laws that cross-reference Section 43.251 of the Texas Penal Code, including the nuisance statute. *See* Tex. Civ. Prac. & Rem. Code § 125.0015(a)(22). It also affects other provisions, including Chapter 20A, which enumerates trafficking crimes. Tex. Penal Code § 20A.02(a)(7)(J). Chapter 20A, in turn, is referenced in Chapter 140A of the Texas Civil Practice & Remedies Code. *See, e.g.*, Tex. Civ. Prac. & Rem. Code § 140A.002 ("A person or enterprise commits racketeering if, for financial gain, the person or enterprise commits an offense under Chapter 20A … and the offense or an element of the offense: (1) occurs in more than one county in this state; or (2) is facilitated by the use of United States mail, e-mail, telephone, facsimile, or a wireless communication from one county in this state to another.").

Finally, Section 6 of S.B. 315 amended several provisions of Labor Code Chapter 51, which regulates "Employment of Children," to provide that "[a] sexually oriented business may not employ or enter into a contract, other than a contract described by Subsection (g), for the performance of work or the provision of a service with an individual younger than 21 [18] years of age." Tex. S.B. 315, § 6, 87th Leg. R.S. (2021) (amending Tex. Labor Code § 51.016(b)) (formatting in original). A violation of Section 51.016(b) now constitutes a Class A misdemeanor subject to a one-year jail sentence, administrative penalties, or a suit for injunctive relief brought by the Attorney General of Texas. Tex. S.B. 315, § 7, 87th Leg. R.S. (2021).

Texas justified S.B. 315 as solving a need to "provide necessary mechanisms to safeguard our communities and children from trafficking and sexual exploitation, which are often harmful secondary effects of sexually oriented businesses." Senate Research Center, Bill Analysis, Tex. S.B. 315, 87th Leg. R.S. (2021). Plaintiffs allege the law violates their First Amendment rights.

**B. The Parties**

Plaintiffs consist of the TEA, a non-profit trade association that represents adult cabarets and bookstores; Lone Starr Multi-Theatres, Ltd, *d/b/a* New Fine Arts West ("New Fine Arts"), an adult bookstore and adult video arcade subject to S.B. 315's age restriction; and XTC Cabaret, Inc. ("XTC") and RCI Dining Services (Round Rock), Inc. ("Rick's Cabaret"), adult cabarets in Texas owned by the same parent company. (Joint Facts, Dkt. 99, at 2; Anakar Dep., Dkt. 71-40, at 13). Plaintiffs sued Ken Paxton, the Attorney General for the State of Texas, and Ed Serna, the Executive Director of the Texas Workforce Commission, in their official capacities. (*Id.*).

**C. Procedural History**

Four days after filing suit, Plaintiffs moved for a preliminary injunction. (Mot. Prelim. Inj., Dkt. 5). The Court held a hearing on the matter and denied Plaintiffs' motion on July 20, 2021. (Order, Dkt. 29). Applying intermediate scrutiny, the Court found that Texas passed S.B. 315 with the reasonable belief that it would curb sex trafficking and sufficiently tailored the law to that end. (*Id.* at 8–10). The Court rejected Plaintiffs' overbreadth challenge on similar grounds, finding that Plaintiffs had failed to show substantial unconstitutional applications of the law in relation to their legitimate application. (*Id.* at 12). Finally, the Court rejected Plaintiffs' Due Process Claims and vagueness challenge, which were later dropped from Plaintiffs' amended complaint. (*Id.* at 14–15; Am. Compl., Dkt. 39).

Following discovery, the parties filed cross-motions for summary judgment. (Dkts. 66, 71). The Court denied both motions, finding that: (1) intermediate scrutiny applied to Plaintiffs' First Amendment claims, and (2) the intermediate scrutiny analysis depended upon factual determinations, making summary judgment inappropriate. (Dkts. 85, 90). The case then proceeded to a bench trial, where the parties agreed to admit the large majority of exhibits used in the preliminary injunction hearing and their summary judgment briefing. (Dkts. 111, 103).

## II. SUMMARY OF THE EVIDENCE

### A. Legislative Record

S.B. 315 was assigned to the Committee on Jurisprudence in the Texas Senate. Texas Legislature Online - 87(R) History for S.B. 315 ("S.B. 315 Bill History") (last visited Jan. 6, 2023). Its companion bill, House Bill 3520 ("H.B. 3520"), was assigned to the Licensing and Administrative Procedures Committee in the Texas House of Representatives. Texas Legislature Online - 87(R) History for H.B. 3520 ("H.B. 3520 Bill History"). Each of these committees conducted open hearings and received evidence and testimony regarding the bills. S.B. 315 Bill History; H.B. 3520 Bill History.

The Senate Committee on Jurisprudence heard several witnesses speak. Senate Committee on Jurisprudence, Testimony on S.B. 315 (April 22, 2021), available at https://tlcsenate.granicus.com/MediaPlayer.php?view_id=49&clip_id=15817 (last visited Apr. 3, 2024). Cara Pierce ("Pierce") testified that, in her 12 years as a federal prosecutor in the Northern District of Texas, she prosecuted 81 human trafficking cases, and that SOBs played a role in 46 of them. *Id.* at 43:30.[2] She testified that sex traffickers (in her words, "pimps") recruited victims from strip clubs and forced them to work there. *Id.* Pierce also testified that almost all the adult victims she encountered were under the age of 21. *Id.* Pierce also clarified that the language of S.B. 315 was supported by the Texas Human Trafficking Prevention Task Force—a legislatively-created body comprised of 130 member organizations, including prosecutorial agencies, law enforcement agencies, and social service providers in the field of human trafficking—because they believed it would reduce human trafficking. *Id.*

---

[2] On cross-examination in this case, Pierce noted that she counts each criminal defendant as a separate case, even if they are co-defendants. (Tr., Dkt. 116, at 247–50). The number falls from 46 to 17 if Pierce batches co-defendants together. (*Id.*). However, the record does not reflect how many total sex trafficking cases Pierce prosecuted if she counts co-defendants as one case.

George P. Bush, then Texas Land Commissioner, testified in his private capacity, informing the committee of studies that show 70% of trafficking victims are females trafficked in the commercial sex industry, which includes the porn industry, strip clubs, and brothels. *Id.* at 47:20. He also cited a study that purported to reveal that 65% of women who work in strip clubs have been victims of sexual exploitation, and nearly a third have been trafficked in strip clubs. *Id.*

Jessica Wesley, a survivor leader, testified about her own experience working in strip clubs. *Id.* at 55:10. She stated that in her teen years, she found herself trying to cope with her mother's alcoholism, her father's death, and her own addictions. *Id.* At the age of 18, she was recruited by another dancer to work in a strip club. *Id.* Her audition consisted of getting naked in front of the manager. *Id.* She felt so uncomfortable during her first night at the club that she took a valium. *Id.* Thereafter, she was encouraged to drink on the job and was never denied alcohol. *Id.* She testified that "money talks," and the strip club employees and managers would look the other way from illegal behavior if the money was right. *Id.* In her ten years working in a strip club, she testified she was the victim of numerous sexual assaults, and that she was drunk or high on cocaine 95% of the time she worked there. *Id.*

Nisi Hamilton, a sex trafficking survivor, testified that she became a victim of sex trafficking at the age of 14. *Id.* at 59:50. At the age of 16, she began working in strip clubs to earn money for her trafficker. *Id.* She testified that her trafficker had established relationships with strip clubs that allowed him to get her on stage despite her age. *Id.* She testified that "while in captivity at the club," she was given alcohol so she could relax and "play nice." *Id.* Hamilton testified that she was required to wear makeup to look older, and that she could pass for 18, but not 21. *Id.*

In addition to the Senate Committee, the House Licensing & Administrative Procedures Committee convened and heard testimony and received evidence from several witnesses on H.B. 3520. Licensing & Administrative Procedures S/C Business and Occupational Regulation,

Testimony on H.B. 3520 (April 9, 2021), available at

https://tlchouse.granicus.com/MediaPlayer.php?view_id=46&clip_id=20220, (Last visited April 3,

2024).

  Lisa Michelle, the founder of a nonprofit group that works with women in the sex industry,

testified that as part of her outreach with the Bexar County juvenile justice system, she worked with

22 minors who were confirmed to be victims of trafficking. *Id.* at 6:45. She testified that all 22 of

these minors had worked inside SOBs. *Id.* Joe Madison, who works at a different nonprofit that

seeks to combat porn and human trafficking, testified that he has interacted with hundreds of people

who he calls "sex buyers" as part of his nonprofit work. *Id.* at 10:45. He informed the committee

that sex buyers frequent strip clubs and prefer younger dancers because they are presumed to be less

likely to have sexually transmitted diseases. *Id.*

  In addition, the House received several studies purporting to link SOBs with human

trafficking or other public health risks. These include studies showing 61% of exotic dancers

reporting in engaging in transactional sex, 67% of whom did so after working in an SOB. Jacqueline

Reuben, et al., *Correlates of Current Transactional Sex Among a Sample of Female Exotic Dancers in Baltimore,*

*MD*, Journal of Urban Health: 88 Bulletin of the New York Academy of Medicine

342 (2011). Other studies showed increased risks of violence around SOBs or potential health risks

due to open exposure to semen. (Minneapolis Env. Health Rep., Dkt. 71-28, at 63; McCord &

Tewksbury Study, Dkt. 71-11, at 64). Other reports included investigators who visited adult video

shops and bookstores and observed individuals masturbating, participating in "peepshows," or

offering to perform sexual acts on the investigators for pay. (Police Reports, Dkt. 71-14). Several

reports submitted to the House focused on the connection between stripping and prostitution,

containing anecdotes that many strippers begin their career at 18 years old, regularly encounter

customers who request or demand intercourse, and are often forced into prostitution due to their

work at SOBs. (*See* Holsopple Rep., Dkt. 71-26, at 140; Sherman Rep., Dkt. 71-26, at 157; Carnes Decl., Dkt. 71-32, at 16; Salcedo Decl., Dkt. 71-32, at 34).

### B. Plaintiffs' Testimony

The parties also offered several witnesses, both at the preliminary injunction hearing and the bench trial.

#### 1.  Texas Entertainment Association

Plaintiff TEA is a trade association for SOBs in Texas. (Richardson Dep., Dkt. 73-3, at 29). Its members include nightclubs that offer nude or seminude dancing, adult bookstores, adult video stores, and adult arcades. (*Id.*). Kevin Richardson ("Richardson") served as the representative for TEA and testified at the Court's preliminary injunction hearing. (Tr., Dkt. 32, at 69). He estimated that over 10,000 employees and contractors have been laid off as a result of S.B. 315, including dancers, bartenders, security personnel, and office personnel. (*Id.* at 76). He also testified that TEA offers sex trafficking training and awareness courses to its members through a curriculum known as "COAST" (Club Owners Against Trafficking). (*Id.* at 79).

In his deposition, Richardson testified that TEA does not require businesses to abide by local ordinances regulating strip clubs in order to obtain membership in the organization. (Richardson Dep., Dkt. 71-39, at 14). He also testified that he knew of no repercussions for members who have had sex trafficking occur at one of their locations. (*Id.* at 26). Richardson also testified that he knew of at least one instance of human trafficking at an SOB. (*Id.* at 38–44). At the Court's preliminary injunction hearing, Richardson related an anecdote regarding his efforts to help an employee escape exploitation when the police did not help her. (Tr., Dkt. 38, at 74–76).

#### 2.  New Fine Arts

Plaintiff New Fine Arts is an adult store that primarily offers sexually explicit toys, items, and clothes. (Hartstein Dep., Dkt. 71-38). Gary Hartstein, the corporate representative, testified that

most of the store's revenue comes from selling sex items and lingerie. (*Id.* at 9). The store also sells DVDs and magazines, although they constitute a smaller portion of its revenue. (*Id.*). He testified that his store has security cameras throughout the premises and security personnel to monitor the premises. (Hartstein Dep., Dkt. 73-74). He also testified that the store runs routine background checks on their employees, including checking their age. (*Id.*).

The bookstores offer private rooms for viewing explicit materials. (*Id.* at 12). Two people are allowed in the private rooms at one time and the doors are locked with a key that is given to the customer. (*Id.*). Harstein testified that he does not "want to know what's going on behind closed doors," including the possibility that people have intercourse in those rooms. (*Id.* at 12–13). The stores do not have policies related to human trafficking or prostitution, and Harstein states that there is no such trafficking at the bookstores. (*Id.*).[3] Harstein also noted that although the store itself does not want commercial sex occurring on premise, prostitutes have sometimes entered the store's private rooms to engage in commercial sex. (Hartstein Dep., Dkt. 71-38, at 17).

### 3.  XTC and Rick's Cabaret

Ed Anakar ("Anakar"), the corporate representative for both Plaintiffs XTC and Rick's Cabaret, testified that the clubs comply with regulations regarding SOBs and take proactive measures to prevent crime and human trafficking from occurring at their premises. (Anakar Dep., Dkt. 73-4). He testified that he has not seen sex trafficking at these SOBs, which are regularly inspected by law enforcement. (*Id.*). He testified that dancers must submit identification to verify their age, and that their identification is checked on a regular basis. (*Id.*).

Defendants point out that XTC and Rick's Cabaret's holding company recently acquired several SOBs that have been accused of sex trafficking by local and federal authorities. (Anakar

---

[3] Pierce, a witness for Defendants, testified that in a sex trafficking case she prosecuted, the defendant had brought one of the underage female victims to a New Fine Arts store, booked a private room, and sold the underage girl for sex. (Tr., Dkt. 71-2, at 12).

Dep., Dkt. 71-40, at 40). Specifically, the holding company acquired several "Chicas Locas" establishments, which Defendants state have been the subject of months-long Houston Police Department investigations resulting in the arrest of 42 individuals for prostitution. (*Id.* at 41). Anakar testified that while he had heard of the allegations against Chicas Locas, he had not seen definitive proof or convictions related to the alleged prostitution. (*Id.*).

### C. The Parties' Expert Witnesses

#### 1. Angela Spencer-Crisp

Angela Spencer-Crisp ("Spencer-Crisp") served as Plaintiffs' main expert witness at trial. Spencer-Crisp graduated from college with a degree in psychology and earned a master's degree in strategic public relations. (Tr., Dkt. 116, at 16). Spencer-Crisp performed at adult nightclubs from 1989 to 1996. (*Id.*). She then worked as a bartender, waitress, and manager, and eventually became the co-owner of a nightclub. (*Id.*). In 2003, she became the Executive Director of ACE National, a federal trade association for the adult nightclub industry. (*Id.* at 18). She also co-founded COAST, the training program for club owners to prevent sex trafficking. (*Id.*). As part of her work for ACE National, Spencer-Crisp tracks legislative efforts across the country to regulate SOBs. (*Id.*). As part of that work, she examined governmental and non-profit reports related to sex-trafficking at SOBs, particularly for 18- to 20-year-olds. (*Id.*).

In response to the Texas Legislature's consideration of S.B. 315, Spencer-Crisp wrote a paper on sex trafficking in Texas SOBs. (*Id.* at 72). The paper concludes that SOBs do not experience high levels of sex trafficking, and that less than one percent of human trafficking in Texas occurs in SOBs. (*Id.* at 28).The paper has not been peer-reviewed or published. (*Id.* at 72). She testified that nobody asked her to write the paper, and that she has only submitted it to Plaintiffs' counsel. (*Id.*).

Defendants extensively questioned Spencer-Crisp on her paper's methodology. First, they pointed out that she relied upon data from the National Human Trafficking Hotline ("NHTH"), which only contains information from self-reported sources. (*Id.* at 46). She acknowledged that the NHTH source is not an indication of the prevalence of sex trafficking. (*Id.*). Spencer-Crisp also relied on the FBI's Uniform Crime Report but acknowledged that federal prosecutors may choose to omit data from their reports, and that the FBI lacks any information related to state prosecutions or civil actions. (*Id.* at 50). Defendants argued that Spencer-Crisp included other statistical errors, such as not properly calculating a confidence rate, failing to include formulas for frequency distributions, and relying on spreadsheet data not included in the report itself. (*Id.* at 50–65).

## 2. Cara Pierce

Defendants introduced two expert witnesses at trial, the first of whom was Pierce, a former federal sex-trafficking prosecutor. (Tr., Dkt. 116, at 210). Pierce served as the human trafficking coordinator for the Northern District of Texas for ten years and also worked in Texas's Human Trafficking Prevention Task Force. (*Id.*). During her time as Assistant U.S. Attorney, Pierce prosecuted dozens of human trafficking cases, more than half of which involved SOBs. (*Id.* at 213). She is currently an assistant professor at Southern Methodist University. (*Id.* at 213).

Pierce testified that SOBs are frequent venues for sex trafficking because they create "sexually charged environments" that cater to sexual desires. (Pierce Dep., Dkt. 71-1, at 21). According to Pierce, traffickers may also use SOBs to accustom individuals to commercial sex environments. (*Id.*). Piece stated that many of her trafficking investigations involved SOBs that were members of TEA. (*Id.*). She also testified that she had provided similar information to the Texas Legislature during the passage of S.B. 315.

### 3. Dr. Vanessa Bouché

Defendants also offered Dr. Vanessa Bouché ("Dr. Bouché") as a witness. Dr. Bouché has a Ph.D. in political science from Ohio State University and currently teaches classes on human trafficking and survey research (among other topics) at Texas Christian University. (Tr., Dkt. 116, at 213). A previous analyst at the Central Intelligence Agency, Dr. Bouché also serves as a consultant for nonprofits that study human trafficking. (*Id.* at 215).

Dr. Bouché testified and provided an export report arguing that S.B. 315 will reduce sex trafficking at SOBs. (Bouché Rep., Dkt. 71-6, at 6). Her report shows that 24% of sex trafficking victims experienced trafficking at a strip club, while another survey she conducted put the figure at 28%. (*Id.* at 4–6). However, the most frequent locations of trafficking were found to be street prostitution, online prostitution, and escort services, rather than SOBs. (*Id.* at 188). Dr. Bouché describes various push-pull factors that lead women into trafficking and identifies their age and psychological maturity as a key factor in determining a person's susceptibility to trafficking. (*Id.* at 148). Dr. Bouché also stated that, based on her review of various studies, the average age of entry into sex trafficking is 18-to-20 years. (*Id.* at 146).

### D. Preliminary Injunction Fact Witnesses

Other witnesses testified at the Court's preliminary injunction and that evidence was incorporated into the record at trial pursuant to Federal Rule of Civil Procedure 65(a)(2).

### 1. Abigail Reyes

Reyes testified at the Court's preliminary injunction hearing that she was employed at New Fine Arts. (Tr., Dkt. 32, at 49). She was 19 years old at the time but has since turned 21. (*Id.*). She testified that she has never witnessed any human trafficking at New Fine Arts. (*Id.* at 51). However, she also admitted that she received no training in identifying trafficking beyond her own research. (*Id.* at 51–54).

### 2. Amanda Man

Man testified at the preliminary injunction hearing that she worked at the Baby Dolls Saloon, an adult cabaret. (*Id.* at 55). She was 19 at the time but has since turned 21. (*Id.*). She testified that she has seen "pimps" at adult cabarets and has known women who were controlled by pimps. (*Id.* at 58). However, she stated that most women were 23 to 26 years of age "because they feel like they're running out of time to get their life together." (*Id.*). However, she also noted that she had seen a woman under the age of 21 who was controlled by a "pimp." (*Id.*).

### 3. Luis Carrizoza

Carrizoza testified that he worked as a bouncer at an SOB in Odessa, Texas. (*Id.* at 62). He stated that he was laid off from that SOB because S.B. 315 took effect, making it illegal for him to continue working there, as he was under 21 years of age. (*Id.* at 63). However, he still provides security for the SOB through employment with a third-party contractor. (*Id.* at 64).

### 4. Evanny Salazar

Salazar also testified at the July 16, 2021 preliminary injunction hearing about her experiences as an exotic dancer. (*Id.* at 83). Prior to the passage of S.B. 315, Salazar worked at two adult cabarets in San Antonio, Texas, where she earned about $1,000 a night. (*Id.*). Salazar had not witnessed human trafficking at either club. (*Id.*). Before she worked as an exotic dancer, Salazar was homeless and lived in her car. (*Id.*). Her job at the adult cabarets allowed her to obtain housing and cover her living expenses. (*Id.*). Since losing her job as an exotic dancer due to her age, Salazar had to change to a lower paying job and became homeless. (*Id.*).

# III. DISCUSSION

## A. Level of Scrutiny

Intermediate scrutiny applies to Plaintiffs' First Amendment challenge. The Court has already held that intermediate scrutiny applies in its summary judgment holding, but that analysis bears repeating in brief. (*See* Order, Dkt. 90).

Courts analyze content-neutral justifications of SOBs based on the framework set forth in *City of Renton v. Playtime Theatres*, 475 U.S. 41 (1986).[4] The first step asks whether the measure "ban[s]" SOBs or regulates only the "time, place, and manner" of their operation. *Id.* at 46. If the latter, the second step asks whether the regulation is "designed to combat the undesirable secondary effects" of "businesses that purvey sexually explicit materials" rather than to restrict their "free expression." *Id.* at 48–49. A regulation satisfying both steps is "reviewed under the standards applicable to 'content-neutral' time, place, and manner regulations," namely intermediate scrutiny. *Id.* at 50. If a statute satisfies these criteria, courts examine whether it passes the intermediate scrutiny test set forth in *United States v. O'Brien*, 391 U.S. 367 (1968).

Here, S.B. 315 does not ban SOBs or prohibit all expressive or explicit dancing. Instead, S.B. 315 regulates the minimum age of employees at SOBs. It satisfies *Renton*'s first prong: SOBs may still

---

[4] The Fifth Circuit has affirmed that the secondary effects test remains valid precedent. In *Reed v. Town of Gilbert*, the Supreme Court held that "a regulation of speech on its face draws distinctions based on the message a speaker conveys" even if it contains a "content-neutral justification." 576 U.S. 155, 165 (2015). Pursuant to this doctrinal "sea change" in First Amendment law, the Fifth Circuit found that *Reed* abrogated the secondary effects doctrine. *See Reagan Nat'l Advert. of Austin, Inc. v. City of Austin*, 972 F.3d 696 (5th Cir. 2020). That opinion, however, was then reversed by the Supreme Court (on largely different grounds). *City of Austin* v. *Reagan Nat'l Advert. of Austin, Inc.*, 596 U.S. 61 (2022). Another Fifth Circuit panel, however, reached the opposite result and held that *Reed* did not abrogate the secondary effects doctrine. *See Tex. Ent. Assoc., Inc. v. Hegar*, 10 F.4th 495, 509 (5th Cir. 2021) (distinguishing *Reed* and applying intermediate scrutiny).

The Fifth Circuit has now settled the question. In *Ass'n of Club Executives v. City of Dallas*, the circuit court affirmed that the secondary effects doctrine remains good law. 83 F.4th 958 (5th Cir. 2023), *cert. denied*, No. 23-835, 2024 WL 1143708 (U.S. Mar. 18, 2024). The appeals court held that *Reed* did not abrogate *Renton* and therefore, intermediate scrutiny applies to regulations that satisfy *Renton*'s two-step inquiry. *Id.*

showcase dancing, and 18- to 20-year-olds may still engage in explicit dancing outside of their

employment at SOBs. Second, the Court asks whether the law is designed to prohibit free

expression or to regulate the secondary effects of that expression. S.B. 315 also passes the second

step. Texas passed S.B. 315 to combat sex trafficking under the belief that such trafficking occurs at

SOBs, a secondary effect of their free expression. *See infra*, Section II.A (discussing S.B. 315's

legislative history).

### B. Intermediate Scrutiny

Because S.B. 315 does not ban SOBs and is not designed to prohibit their expression, the

*O'Brien* intermediate scrutiny standard applies. *O'Brien* lays out a four-factor test, holding that a

government regulation is justified if it is:

> [1] within the constitutional power of the Government; [2] if it furthers
> an important or substantial governmental interest; [3] if the
> governmental interest is unrelated to the suppression of free
> expression; and [4] if the incidental restriction on alleged First
> Amendment freedoms is no greater than essential to the furtherance
> of that interest.

*O'Brien*, 391 U.S. at 377.

The first and third factors are uncontested. First, the State of Texas has the constitutional

authority to regulate the employment and minimum age levels of workers at SOBs. Third, the stated

governmental interest is unrelated to the suppression of free expression. Defendants claim that

Texas passed S.B. 315 for the content-neutral purpose of stopping sex trafficking, not for the

purpose of prohibiting expression itself.

Instead, the parties focus on the second and fourth factors: whether S.B. 315's incidental

restriction on First Amendment expression is no greater than necessary to further the state's goal.

These questions—whether age restrictions on SOBs adequately and narrowly serve the state's goal

of reducing sex trafficking—form the basis of the parties' evidentiary dispute. Within that question,

Plaintiffs make two core arguments: (1) regarding the second factor, that S.B. 315 does not further

the state's goal because sex trafficking does not occur frequently at SOBs; and (2) regarding the fourth factor, S.B. 315 regulates more employees at SOBs than necessary to prevent sex trafficking.

<u>1. Factor Two: S.B. 315 Furthers the State's Interest in Reducing Sex Trafficking</u>

As to Texas's goal of preventing sex trafficking, the Court finds that Defendants have introduced substantial, credible evidence linking SOBs to sex trafficking. Both legislative chambers considered hundreds of pages of testimony and exhibits linking sex trafficking, at least in part, to SOBs. *See infra*, Section II.A. Further, Pierce testified that, in her experience as a federal prosecutor, SOBs played a role in over half her human trafficking cases. *See infra*, Section II.C.2. Other studies suggested that up to 75% of dancers at SOBs have engaged in prostitution, that trafficking occurs frequently at SOBs, and that 18- to 20-year-olds are particularly susceptible to trafficking. *Infra*, Section II.A.

In the context of intermediate scrutiny, Defendants' evidentiary burden is not heavy. *Doe I v. Landry*, 909 F.3d 99, 109 (5th Cir. 2018) ("The evidentiary burden to support the governmental interest is light."). Defendants have introduced convincing evidence that sex trafficking occurs in SOBs at higher rates than other businesses, and they have introduced evidence that young adults are frequent victims of trafficking. The nexus—whether young adults at SOBs are likely to be trafficked—is less well-documented. But even then, Defendants' burden does not require them to show specific evidence related to their precise regulation and target group. *See Ass'n of Club Exec.*, 83 F.4th at 967 ("The standard does not require a city to forge an ironclad connection between SOBs and secondary effects or to produce studies examining precisely the same conditions at issue."); *Landry*, 909 F.3d at 110 ("The State need not demonstrate through empirical data, though, that its regulation will reduce such trafficking."). It is reasonable for Texas to believe that if young adults are vulnerable to sex trafficking, a regulation that prohibits them from working at places with high rates of such trafficking will trafficking overall. *See Ass'n of Club Exec.*, 83 F.4th at 967 ("all [the secondary

effects test] demands is evidence 'reasonably believed to be relevant' to the problem") (quoting *Renton*, 475 U.S. at 51).

Plaintiffs' evidence, by contrast, tends to suggest that SOBs account for a very limited amount of sex trafficking, including among 18- to 20-year-olds. For example, Plaintiffs dispute the number of criminal prosecutions by Pierce that involved SOBs, noting that references to adult nightclubs are found in only four of her seventeen cases. (Pls.' Proposed Findings of Fact, Dkt. 114, at 29–30; Tr., Dkt. 116, at 258). Plaintiffs also rely on the testimony of Spencer-Crisp, whose study concludes that SOBs account for no more than 1% of sex trafficking in the state. (Tr., Dkt. 116, at 26–27).

The Court has significant doubts about the reliability of Spencer-Crisp's empirical research, and ultimately finds it much less credible than the testimony of Pierce or Dr. Bouché.[5] But even setting aside the determination of Spencer-Crisp's credibility, Plaintiffs do not show that Defendants' belief was unreasonable that young adults at SOBs are at risk of sex-trafficking. *See Baby Dolls Topless Saloons, Inc. v. City of Dallas*, 295 F.3d 471, 481 (5th Cir. 2002) (secondary effects test is a "reasonable belief standard"). Accepting, for the sake of argument, that Plaintiffs have demonstrated some doubt as to the link between SOBs and sex trafficking, the Court's conclusion would not change. "[C]ourts should not be in the business of second-guessing fact-bound empirical assessments of city planners" because they "know[ ] the streets" of their cities "better than we do." *City of Los Angeles v. Alameda Books*, 535 U.S. 425, 451–52 (Kennedy, J., concurring in the judgment);

---

[5] As Defendants showed in their cross-examination, Spencer-Crisp's conclusions relied in large part on drawing frequency observations from datasets that disclaim their usefulness for frequency observations. (Tr., Dkt. 116, at 56–65). Nor does the report calculate margins of error or confidence rates. (*Id.* at 63–64). In a previous order, the Court found that Spencer-Crisp's testimony was admissible, largely on the basis that Rule 702 plays a significantly diminished role in bench trials. (Order, Dkt. 63). While the testimony is admissible, it is not persuasive. Her study is not replicable, because key conclusions omit their calculations; it is not peer-reviewed; and it relies on inferences from studies that specifically disclaim the drawing of those same inferences.

*see also N.W. Enterprises Inc. v. City of Houston*, 352 F.3d 162 (5th Cir. 2003) (courts must "respect[ ] local legislators' superior understanding of local problems"). The Texas Legislature reasonably relied on its assessment of the evidence linking SOBs to sex trafficking. Plaintiffs' witness, even considered equally credible to Defendants' witnesses, does not make Texas's belief unreasonable.

In sum, Defendants have demonstrated that the goal of reducing sex trafficking "would be achieved less effectively absent the" ban on young adults working at SOBs. *United States v. Albertini*, 472 U.S. 675, 689 (1985). Plaintiffs have failed to show through "actual and convincing" evidence that the state's policy is inadequate. *Landry*, 909 F.3d at 110. Accordingly, the Court finds that S.B. 315 passes *O'Brien*'s second factor.

### 2. Factor Four: S.B. 315 Does Not Restrict Substantially More Speech Than Necessary

Plaintiffs next argue that S.B. 315 cannot pass narrow tailoring because it includes all employment positions at SOBs, even though Defendants' evidence points almost exclusively to dancers and strippers being vulnerable to sex trafficking. (*See* Pls.' Proposed Findings, Dkt. 114, at 36–37 ("Nonetheless, SB 315 applies to every conceivable position at an adult nightclub, including managers, floor hosts, office workers . . . .")). As Defendants' own witness testified:

> THE COURT: If the state of Texas had chosen to more narrowly tailor this law to the population that you've identified as the state's expert as the population that is vulnerable and worthy of protection by this law, if they had narrowed it to just those people and that is 18-to-20-year-old entertainers or dancers, would that address the vast majority of the risk and danger that you've identified as justifying this law?
>
> Dr. Bouché: I believe that that was the intent when -- I would say yes.

(Tr., Dkt. 116, at 199–201).

Under intermediate scrutiny, a statute must be narrowly tailored, "promot[ing] the substantial government interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989); *Landry*, 909 F.3d at 111 (same). While the regulation

must be narrowly tailored to serve the government's interests, it "need not be the least restrictive or least intrusive means of doing so." *Ward*, 491 U.S. at 798. Rather, the regulation must not "burden substantially more speech than is necessary to further the government's legitimate interests." *McCullen v. Coakley*, 575 U.S. 464, 484 (2014).

Still, that tailoring analysis is focused on the regulation's effect on First Amendment activity, not generic commerce or conduct. Narrow tailoring requires that "incidental restriction on alleged *First Amendment freedoms* is no greater than is essential to the furtherance of that interest." *Landry*, 909 F.3d at 110 (quoting *O'Brien*, 391 U.S. at 377) (emphasis added)); *McCullen*, 575 U.S. at 486 ("[T]he government still may not regulate expression in such a manner that a substantial portion *of the burden on speech* does not serve to advance the State's goals.") (internal quotations omitted) (emphasis added). Thus, the inquiry is whether the regulation could be "less burdensome *on speech*." *Albertini*, 472 U.S. at 689 (emphasis added). The narrow tailoring inquiry does not examine whether a statute is overly burdensome generally, but whether the statute overly burdens First Amendment activity.

Here, S.B. 315 plainly regulates more than necessary to stop sex trafficking, as it prohibits all employment of 18- to 20-year-olds at SOBs. This ban applies regardless of whether those employment positions are considered vulnerable to trafficking. However, employees at SOBs, such as janitors, parking valets, and security guards, have no demonstrated First Amendment expression intertwined with their jobs. "[O]nly conduct that is 'inherently expressive' is entitled to First Amendment protection," and "the party invoking the First Amendment's protection [has] the burden to prove that it applies." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013). In the context of SOBs, Plaintiffs have not shown that any positions besides dancers are "inherently expressive." Dancers are also the intended target of SOBs, because they are most vulnerable to sex trafficking. *See City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 810 (1984) (upholding regulation where "the application of the ordinance . . . responds precisely to the substantive

problem"). While S.B. 315 may burden employees who are not especially vulnerable to trafficking, those employees' positions also lack First Amendment coverage.

The Fifth Circuit addressed a similar issue when analyzing a "no-touch" provision to nude employees at SOBs in the 1990s. *See Hang On, Inc. v. City of Arlington*, 65 F.3d 1248 (5th Cir. 1995). There, although the Fifth Circuit recognized that nude dancing deserved some First Amendment coverage, that did not extend to non-dancing employees. The circuit court held, "Nonperforming nude employees, however, cannot claim First Amendment protection solely by virtue of their nudity." *Id.* at 1253. Because those "employees not engaged in expressive conduct such as dancing have no First Amendment right to appear in the nude, applying the 'no-touch' provision to non-performing nude employees does not make it overbroad." *Id.* at 1254.

Similarly here, First Amendment coverage is limited to employees performing at SOBs. And it is precisely those employees who engage in expressive conduct (i.e., dancing) that are most likely to be sex trafficked. Employees in other roles (e.g., parking valets, security guards) are not likely to be trafficked, but they also have no expressive speech tied to their employment. S.B. 315 does not burden their speech because their employment positions do not receive First Amendment coverage. Accordingly, while S.B. 315 sweeps broader than necessary, its sweep does not implicate the First Amendment expression of those non-performing workers.

S.B. 315 may still implicate some First Amendment expression because regulations on SOBs will affect their operations, even if not directly impacting dancers or other expressive roles. In *Illusions–Dallas Private Club, Inc. v. Steen*, the Fifth Circuit dealt with a regulation prohibiting the renewal of alcohol permits for private SOB clubs in dry counties. 482 F.3d 299, 305 (5th Cir. 2007). Because the law "regulate[d] the place or manner in which the erotic dancing can occur," intermediate scrutiny applied. *Id.* at 307.

S.B. 315's requirement that all SOB employees to be over 20 years old may regulate the "manner" in which erotic dancing is presented and viewed. By requiring parking valets, store clerks, and waiters to be at least 21, S.B. 315 may potentially have some incidental impact on the ability of SOBs to showcase erotic dancing. However, to the extent that burden exists at all, it has a marginal impact on speech. *See Bd. of Dir. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 544–45 (1987) (noting, in context of intermediate scrutiny for sex discrimination, that statute was constitutional where marginal impact on clubs would not "affect in any significant way the existing members' ability to carry out their various purposes"). Under intermediate scrutiny, S.B. 315 passes constitutional muster if it does not "burden *substantially* more speech than is necessary to further" government interests. *Ward*, 491 U.S. at 799 (emphasis added). As a matter of evidence in this case, it is not clear that requiring parking valets or waiters to be 21 years old will impact the First Amendment rights of SOBs in any substantial way. Plaintiffs may still fill those roles—they just must do so by employing individuals over 20 years old. The marginal restriction on the labor pool for SOBs does not appear significant enough to constitute a "substantial" restriction on speech.

### C. Overbreadth

The "overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *New York v. Ferber*, 458 U.S. 747, 770 (1982) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 616 (1973)). This is highly similar, but not identical, to the question of narrow tailoring. *See Landry*, 909 F.3d at 108 (distinguishing incidental restrictions from overbreadth). Like the narrow tailoring inquiry, the overbreadth analysis asks whether the regulation "may cause others not before the court to refrain from constitutionally protected speech or expression." *Hill v. Colorado*, 530 U.S. 703, 731–32 (2000) (quoting *Broadrick*, 412 U.S. at 612)). "[P]articularly where conduct and not merely speech is involved, we believe that the overbreadth of

a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615.

S.B. 315 regulates broad swaths of employment at SOBs, regardless of whether they are tied to sex trafficking. But as with the narrow tailoring analysis, S.B. 315 is not chilling free expression by restricting the age of non-expressive positions. To the extent there is any expression involved in serving as a waiter, janitor, parking valet, or clerk at an SOB, it is not "substantial . . . judged in relation to [S.B. 315's] plainly legitimate sweep." *Id.* Accordingly, the Court finds that S.B. 315 is not unconstitutionally overbroad.

### D. Associational Freedom Claims

Plaintiffs have abandoned any associational freedom claims they initially alleged. (*See* Am. Compl., Dkt. 39, at 15–16 (bringing a cause of action for violating associational rights of SOBs)). Plaintiffs made no mention of their associational freedom claims in their motion for summary judgment, offered no response to Defendants' motion for summary judgment on those claims, and provided no proposed conclusions of law on those claims. (*See* Dkts. 66, 71, 73, 114). Accordingly, the associational freedom claims have been abandoned.

### IV. CONCLUSION

Based on these findings of fact and conclusions of law, the Court finds that S.B. 315 does not violate Plaintiffs' First Amendment rights.

As stated in the record, **IT IS ORDERED** that Plaintiffs Valadez, Carrizoza, Reyes, Man, and Salazar are **TERMINATED** as parties in this case.

A final judgment will be entered separately.

**SIGNED** on April 30, 2024.

_____

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE